UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JAMES E. BATES,
    Petitioner,
v.                                          Case No. 8:22-cv-2895-KKM-SPF

SECRETARY, DEPARTMENT
OF CORRECTIONS,
    Respondent.
_____

### ORDER

    James E. Bates, a Florida prisoner, timely[1] filed a pro se Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254, challenging his state-court convictions for first-degree felony murder and robbery. (Doc. 1.) Having considered the petition, (*id*.), and the response in opposition, (Doc. 16), the petition is denied.[2] Because reasonable jurists would not disagree, a certificate of appealability also is not warranted.

## I.    BACKGROUND

---

[1] A state prisoner has one year from the date his judgment becomes final to file a § 2254 petition. *See* 28 U.S.C. § 2244(d)(1). This one-year limitation period is tolled during the pendency of a properly filed state motion seeking collateral relief. *See id.* § 2244(d)(2). The appellate court affirmed Bates's convictions on October 7, 2015. (Doc. 16-2, Ex. 30.) His judgment became final 90 days later, on January 5, 2016, when the time to petition the Supreme Court of the United States for a writ of certiorari expired. *See Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002). After 261 days of untolled time, on September 23, 2016, Bates moved for postconviction relief under Florida Rule of Criminal Procedure 3.850. (Doc. 16-2, Ex. 31.) That motion remained pending—and the limitation period was paused—until December 12, 2022, when the appellate mandate issued. (*Id.*, Ex. 49.) At that point, Bates had 104 days—or until March 27, 2023—to seek federal habeas relief. He met the deadline, filing his petition on December 16, 2022. (Doc. 1 at 1.) Therefore, the petition is timely.

[2] Bates did not file a reply.

1

This case arises from the murder and robbery of Michael Blue. On the morning of August 29, 2012, Jacniqua Jones accompanied Blue to a doctor's appointment in Tampa, Florida. (Doc. 16-2, Ex. 15, at 326, 328.) During the appointment, Blue obtained a prescription for Dilaudid. (*Id.* at 332.) He filled the prescription at a Kmart while Jones waited in the car. (*Id.* at 330.) The two then drove to a Walgreens and "got high" on Dilaudid in the parking lot. (*Id.* at 331–32.) Around this time, Bates called Jones. (*Id.* at 331.) He wanted a ride to purchase crack cocaine. (*Id.* at 326, 331.) Jones told Bates that she was with Blue, a man Bates had never met. (*Id.* at 333.) Bates did not want a stranger at his house, so he told Jones to drop Blue off at a nearby gas station before picking Bates up. (*Id.*)

Jones left Blue at the gas station and drove to Bates's house. (*Id.* at 333–34.) Jones and Bates then returned to the gas station to retrieve Blue. (*Id.*) Afterwards, the three drove to an apartment complex to buy crack. (*Id.* at 334.) During the drive, Blue complained that he "hadn't gotten as many pills as he wanted." (*Id.* at 335.) After Bates bought the crack, the three drove to a park in Palmetto "to get high." (*Id.* at 335–36.) Blue gave Jones some of his pills and got out of the car. (*Id.* at 336, 339.) Bates told Jones that he "wanted to rob" Blue. (*Id.* at 336.) Bates said he would "choke [Blue] out," and that in "five minutes" Blue would "wake back up." (*Id.* at 337.) Bates and Jones got out of the car and joined Blue by a "railroad tie." (*Id.*)

Soon after, Bates walked to a wooded area and began to smoke crack. (*Id.*) He invited Blue to join him and "hit the crack pipe." (*Id.*) Blue obliged,

whereupon Bates "grabbed him." (*Id.* at 339.) Blue fought back, saying, "Why are you doing this to me[?] . . . . I'm not giving you my pills." (*Id.* at 340.) Jones saw the scuffle, panicked, and went back to the car. (*Id.*) Jones later returned to the wooded area and saw that Bates had Blue in a chokehold. (*Id.*) Jones again walked back to the car. (*Id.* at 341.) About a minute later, Bates returned with Blue's "bag of pills[ ] and syringes." (*Id.* at 342.) Jones never saw Blue again. (*Id.* at 341.) He died of "asphyxia due to manual strangulation." (*Id.* at 298.)

Law enforcement found Blue's body the next day. (*Id.* at 210–12, 219–20.) One week later, a detective interviewed Jones. (*Id.* at 246–47.) She said that a man named "Ken" was with Blue the last time she had seen him. (*Id.* at 248.) Jones gave the detective Ken's phone number. (*Id.*) The detective discovered that the number belonged to Bates. (*Id.* at 249–50, 252.) During an interview, Bates told the detective that Ken was a "drifter [who] came by . . . on occasion to use his phone." (*Id.* at 252–53.) Jones eventually admitted that Ken did not exist. (*Id.* at 343–44.) Bates had told Jones to say that she "left . . . Blue with Ken" at the park, and that Ken did not "have a phone but he [could] be reached through" Bates's number. (*Id.* at 344.)

Bates was ultimately charged with first-degree felony murder and robbery. (*Id.*, Exs. 4, 6.) The case went to trial. Jones testified for the state, describing Bates's role in the offenses and the attempted cover-up. (*Id.*, Ex. 15, at 322–45.) Several pieces of evidence corroborated Jones's account. Surveillance footage captured Blue filling the Dilaudid prescription at the

Kmart. (*Id.* at 237, 240.) Phone records showed that Bates called Jones a dozen times on the day of the murder. (*Id.* at 416–20.) Following his death, Blue tested positive for cocaine and Dilaudid, and his injuries were "consistent with him being in a chokehold." (*Id.* at 280–82, 298.) Lastly, fingernail clippings from Blue's left hand matched Bates's DNA. (*Id.* at 440–41.) The probability that a "randomly selected individual" would have matched the clippings was "approximately one in 550,000." (*Id.* at 441.)

The jury found Bates guilty as charged, and he received a total sentence of life imprisonment. (*Id.*, Exs. 19, 21.) Following an unsuccessful direct appeal, Bates moved for postconviction relief under Florida Rule of Criminal Procedure 3.850. (*Id.*, Exs. 30–32.) The postconviction court held an evidentiary hearing and denied Bates's claims in a written order. (*Id.*, Exs. 36, 41.) The appellate court affirmed in an unexplained decision. (*Id.*, Ex. 48.) This federal habeas petition followed. (Doc. 1.)

## II.   <u>STANDARD OF REVIEW UNDER SECTION 2254</u>

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief under the AEDPA can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "The power of the federal courts to grant a writ of habeas corpus setting aside a state prisoner's conviction on a claim that his conviction was obtained in violation of the United States Constitution is

4

strictly circumscribed." *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1093 (11th Cir. 2022).

Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of § 2254(d)(1), the phrase "clearly established Federal law" encompasses the holdings only of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This section "defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court." *Id.* at 404. First, a decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id*. at 413.

Second, a decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing

legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694. As a result, to obtain relief under the AEDPA, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (stating that "[t]he state court's application of clearly established federal law must be objectively unreasonable" for a federal habeas petitioner to prevail and that the state court's "clear error" is insufficient).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). But the habeas court is "not limited by the particular justifications the state court provided for its reasons, and [it] may consider additional rationales that support the state court's determination." *Jennings v. Secretary, Fla. Dep't of Corr.*, 55 F.4th 1277, 1292

(11th Cir. 2022). When the relevant state-court decision is not accompanied with reasons for the decision—such as a summary affirmance without discussion—the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 584 U.S. at 125. The state may "rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision." *Id.*

For purposes of § 2254(d)(2), "it is not enough to show that 'reasonable minds reviewing the record might disagree about the finding in question.'" *Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022) (quotations omitted). "An unreasonable determination of the facts occurs when the direction of the evidence, viewed cumulatively, was too powerful to conclude anything but the petitioners factual claim." *Teasley v. Warden, Macon State Prison*, 978 F.3d 1349, 1355 (11th Cir. 2020) (internal quotation marks and alterations omitted). A state court's findings of fact are presumed correct, and a petitioner can rebut the presumption of correctness afforded to a state court's factual findings only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Even where a petitioner succeeds in rebutting the presumption, he must show that the state court's decision is "based on" the incorrect factual determination. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022). This is because a state court decision may still be reasonable "even

7

if some of the state court's individual factual findings were erroneous—so long as the decision, taken as a whole, doesn't constitute an 'unreasonable determination of the facts' and isn't 'based on' any such determination." *Id.* (quoting *Hayes v. Sec'y, Fla. Dep't of Corr.*, 10 F.4th 1203, 1224–25 (11th Cir. 2021) (Newsom, J., concurring)).

## III.    <u>INEFFECTIVE ASSISTANCE OF COUNSEL</u>

Bates alleges ineffective assistance of counsel under the Sixth Amendment. Under the well-known, two-part standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed, he must show both deficient performance by his counsel and prejudice resulting from those errors. *Id.* at 687.

The first part "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The lynchpin of this analysis is whether counsel's conduct "was reasonable considering all the circumstances." *Id.* at 688. A petitioner establishes deficient performance if "the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. A court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

The second part requires showing that the deficient performance prejudiced the defense. *Id.* at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"The question [on federal habeas review of an ineffective-assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Consequently, federal petitioners rarely prevail on claims of ineffective assistance of counsel because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation and citations omitted).

## IV.    <u>ANALYSIS</u>

### A. Ground One—Violation of Right to be Present

Bates argues that the trial court violated his "right to be present during critical [proceedings]" by failing to ensure his attendance at two pretrial hearings. (Doc. 1 at 5.)

The first hearing concerned Bates's "motion to compel DNA discovery." (Doc. 16-2, Ex. 9, at 3.) At the hearing, counsel acknowledged that he had received "nine pages" of DNA "results" from the state. (*Id.* at 3–4.) He indicated, however, that he wished to obtain the DNA analyst's "bench notes." (*Id.* at 4.) A private company—DNA Labs International—had done the DNA testing, and it informed counsel that he would have to pay $500 for the notes. (*Id.*) Counsel—an attorney with the Office of Regional Counsel—stated that his "office ha[d] not approved the $500 expenditure."[3] (*Id.*) He therefore argued that the state should "bear the $500 cost" and "provide [him] those notes." (*Id.*) In response, the prosecution stated that the notes were "not within [its] possession," and that it was not required to "bear the costs . . . of the production of these materials." (*Id.* at 6.) The court pointed out that counsel's "written motion" asked only for the DNA results, not the bench notes. (*Id.* at 11.) It declined to rule on the request for the notes unless counsel filed a "specific motion . . . outlining in detail exactly what [he was] seeking, the existence of those documents, the manner in which the lab [was] requiring [him] to obtain them, [and an] affidavit or testimony concerning the financial hardship to [his] office." (*Id.*)

The second hearing took place two weeks later. (*Id.*, Ex. 11.) Counsel stated that his office continued to deny his request for $500 and would not

---

[3] Florida law "requires courts to appoint counsel from the [Office of Regional Counsel] when the public defender has a conflict of interest." *Lewis v. Leon Cnty.*, 73 So. 3d 151, 152 (Fla. 2011).

"let" him seek reimbursement from the Justice Administrative Commission.
(*Id.* at 4.) He claimed to be in contact with a "DNA expert" who "might be
willing to do this pro bono." (*Id.*) Counsel moved for a continuance of the
trial date—his third such request. (*Id.* at 4–5.) The court denied the motion.[4]
(*Id.* at 6.)

Bates contends that the court "erred" by "not requiring" his presence
during these two hearings. (Doc. 1 at 5.) According to him, he was
"unaware" of the hearings and did not know "what [they] involved." (*Id.*)
Bates also says that his presence was "essential." (*Id.*) The appellate court
rejected this claim in an unexplained decision. (Doc. 16-2, Ex. 30.) Thus, Bates
must show that "there was no reasonable basis for the state court to deny
relief." *Richter*, 562 U.S. at 98; *see also Tarleton v. Sec'y, Fla. Dep't of Corr.*, 5
F.4th 1278, 1291 (11th Cir. 2021) ("[Petitioner's] Confrontation Clause claim
was rejected on the merits by the First District Court of Appeal, and there
has been no statement of reasons by any state court for rejecting the claim.
Under *Richter*, [petitioner's] burden is to demonstrate that there was no
reasonable basis for the decision of the First District Court of Appeal to deny
his claim.").

Bates cannot meet his burden. "[E]ven in situations where the
defendant is not actually confronting witnesses or evidence against him, he
has a due process right to be present in his own person whenever his

---

[4] Counsel did not renew the motion to compel.

presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). To establish a violation of this right, the defendant must show that "he could have assisted either his counsel or the court in a way that would have resulted in a more reliable hearing." *United States v. Boyd*, 131 F.3d 951, 954 (11th Cir. 1997). The "privilege of presence is not guaranteed when presence would be useless, or the benefit but a shadow." *Stincer*, 482 U.S. at 745.

A reasonable jurist could conclude that Bates's presence at the two hearings would not have "contribute[d] to the fairness of the procedure." *Id.* The hearings concerned a motion to compel discovery and a motion to continue the trial. Bates does not explain how his presence would have "assisted either his counsel or the court in a way that would have resulted in a more reliable hearing." *Boyd*, 131 F.3d at 954. Instead, he baldly asserts that his presence was "essential." (Doc. 1 at 5.) That unsupported assertion is insufficient. Because "there is no indication that [Bates] could have done [anything] had [he] been at the [hearings] nor would [he] have gained anything by attending," a reasonable jurist could conclude that his right to be present was not violated. *Stincer*, 482 U.S. at 747; *see also United States v. Karmue*, 841 F.3d 24, 27 (1st Cir. 2016) (no violation of right to be present because it was not "clear or obvious . . . what the benefit of [defendant's] presence at the hearing would have been").

## B. Ground Two—Failure to Address "Conflict of Interest"

Bates contends that the trial court violated his right to a "fair trial" by "failing to address" trial counsel's "conflict of interest." (Doc. 1 at 7.) As explained above, counsel sought to obtain the DNA analyst's "bench notes." (Doc. 16-2, Ex. 9, at 4.) DNA Labs International—the company that performed the DNA testing—indicated that the notes would cost $500. (*Id.*) The Office of Regional Counsel refused to approve the expense and would not allow counsel to seek reimbursement from the Justice Administrative Commission. (*Id.*; *see also id.*, Ex. 11, at 4.) Bates claims that, "[o]nce placed on notice" of these facts, the court was obligated to "inquir[e]" into whether the financial dispute "would impair" his right to counsel. (*Id.*, Ex. 28, at 26.) According to Bates, the court's failure to conduct this inquiry requires "revers[al]" of his convictions. (*Id.* at 29.)

Respondent argues that Bates failed to properly exhaust this claim. (Doc. 16 at 15–16.) I need not decide that issue because, even assuming Bates exhausted his state-court remedies, he cannot show that the rejection of Ground Two was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see also Parker v. Head*, 244 F.3d 831, 838 (11th Cir. 2001) (finding it "unnecessary to decide whether or not [petitioner's] Sixth Amendment claim was procedurally defaulted" because, even if it "was not procedurally barred, we cannot say that the [state court's] rejection of [the] claim was contrary to, or an unreasonable application of, clearly established Supreme Court precedent"); *Cook v. McNeil*, 266 F. App'x

843, 846 (11th Cir. 2008) (affirming denial of habeas petition because, "[e]ven if [petitioner] exhausted his due process claim," he could not "establish either that the state courts applied a standard contrary to federal law or that they applied that precedent in an unreasonable manner").

"'[C]learly established Federal law' for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014). The Supreme Court has repeatedly cautioned lower courts against framing its decisions at "a high level of generality." *Nevada v. Jackson*, 569 U.S. 505, 512 (2013); *see also Brown v. Davenport*, 596 U.S. 118, 136 (2022) (noting that "holdings that speak only at a high level of generality" "cannot supply a ground for relief" under AEDPA). Accordingly, "it is not 'an unreasonable application of' 'clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Knowles*, 556 U.S. at 122; *see also Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1288 (11th Cir. 2012) ("The Supreme Court has reiterated, time and again, that, in the absence of a clear answer—that is, a holding by the Supreme Court—about an issue of federal law, we cannot say that a decision of a state court about that unsettled issue was an unreasonable application of clearly established federal law.").

The Supreme Court has never "squarely established" that a trial court must inquire into financial disputes between defense attorneys and their employers. *Knowles*, 556 U.S. at 122. Bates apparently relies on the line of

cases originating in *Holloway v. Arkansas*, 435 U.S. 475 (1978). *Holloway* held that a court must investigate a "timely objection" to joint representation of codefendants—a situation that may involve "conflicting interests." *Id.* at 488–89. The failure to inquire into such conflicts "deprive[s] [defendants] of the guarantee of assistance of counsel" and mandates reversal. *Id.* at 484. But "*Holloway*'s automatic reversal rule is limited only to those circumstances where a trial court improperly requires the joint representation of codefendants overly timely objection." *Dallas v. Warden*, 964 F.3d 1285, 1303 (11th Cir. 2020); *see also United States v. Williamson*, 859 F.3d 843, 856 (10th Cir. 2017) ("[A] potential conflict of interest that is not a multiple representation conflict . . . does not fall under *Holloway*'s 'duty to inquire' into potential conflicts of interest."). No joint representation occurred here. Because the Supreme Court has never clearly established a duty to inquire into financial disputes between defense attorneys and their employers, Bates is not entitled to habeas relief.[5] *See Loggins v. Thomas*, 654 F.3d 1204, 1222 (11th Cir. 2011) ("Because implications are not actual holdings, the implications of Supreme Court decisions cannot clearly establish federal law for § 2254(d)(1) purposes any more than dicta can.").

### C. Ground Three—Failure to "Correct" Discovery Violation

Bates argues that the trial court "erred" by "failing to correct the state's discovery violation." (Doc. 1 at 8.) Bates appears to contend that under

---

[5] To the extent that Bates argues counsel was deficient in handling the DNA evidence, I address that claim below in the discussion of Ground Five.

Florida law, the prosecution was required to pay DNA Labs International for the "complete [DNA] file" and then provide it to his counsel. (*Id.*; *see also* Doc. 16-2, Ex. 28, at 31–33.)

This claim fails because it rests on an alleged misapplication of state law. "[S]tate courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters." *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1355 (11th Cir. 2005). For that reason, "a habeas petition grounded on issues of state law provides no basis for habeas relief." *Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988). Thus, any alleged violation of Florida's discovery rules is not cognizable here. *See Cabberiza v. Moore*, 217 F.3d 1329, 1333 (11th Cir. 2000) ("The writ of habeas corpus was not enacted to enforce state-created rights."); *Brown v. Sec., Fla. Dep't of Corr.*, No. 2:08-cv-447-CEH-DNF, 2011 WL 3875364, at *5 (M.D. Fla. Aug. 31, 2011) (alleged discovery violation under Florida law "cannot establish a federal constitutional violation").

Even if Bates had alleged that the prosecution violated the federal constitution, his claim would still fail because "defendants have 'no general constitutional right to discovery in a criminal case.'" *Lindsey v. Smith*, 820 F.2d 1137, 1151 (11th Cir. 1987) (quoting *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977)). To be sure, *Brady*[6] requires the prosecution "to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of

---

[6] *Brady v. Maryland*, 373 U.S. 83 (1963).

a fair trial." *United States v. Bagley*, 473 U.S. 667, 675 (1985). But Bates does not bring a *Brady* claim here, nor did he do so in state court. And *Brady* does not "create a broad, constitutionally required right of discovery." *Id.* at 675 n.7. Therefore, Bates is not entitled to relief for the alleged discovery violation.

### D. Ground Four—Denial of Continuance

Bates contends that the trial court "erred" by denying his third request to continue the trial date. (Doc. 1 at 10.) But he does not allege that this ruling violated the federal constitution. (*Id.*) That is fatal to his claim. *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) ("The habeas statute unambiguously provides that a federal court may issue a writ of habeas corpus to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" (quoting 28 U.S.C. § 2254(a))).

Even if he had pleaded a violation of the federal constitution, Bates would not be entitled to relief. Trial was initially scheduled for October 2013. (Doc. 16-2, Ex. 50, at 20.) Bates moved for a continuance, citing (among other things) the need to obtain and review "[e]xtensive DNA reports." (*Id.*) The court granted the request and set trial for December 2013. (*Id.* at 21.) Bates moved for another continuance, this time citing the need to review "supplemental discovery." (*Id.* at 22.) The court rescheduled the trial for February 2024. (*Id.* at 25.)

Bates then moved for a third continuance. (*Id.* at 32.) He explained that counsel was "attempting to seek approval either from his office or [the Justice Administrative Commission] for the expenditure for" the DNA bench notes. (*Id.*) As recounted above, the notes cost $500, and counsel's supervisors at the Office of Regional Counsel had refused to approve the expense. (*Id.*, Ex. 9, at 4.) During the hearing on the latest continuance motion, counsel said that his office continued to deny his request and would not allow him to seek reimbursement from the Justice Administrative Commission. (*Id.*, Ex. 11, at 4.) He also claimed to be in contact with a "DNA expert" who "might be willing to do this pro bono" depending on "whether . . . they ha[d] time . . . to look at the records." (*Id.*) Counsel argued that these developments supported "[his] motion to continue." (*Id.*)

 The prosecution opposed the request. (*Id.* at 5.) It noted that (1) this was "the third continuance request in a row," (2) the first continuance request was also based on counsel's "belief that he had not received all of the [DNA] reports," (3) there was no indication that the "issues" between defense counsel and "his office" would "be resolved with additional time," and (4) the victim's family had "been waiting patiently for a long time for this trial." (*Id.* at 5–6.) The court denied the request without explanation, and that decision was affirmed (also without explanation) on direct appeal. (*Id.* at 6; *id.*, Ex. 30.)

Because "there has been no statement of reasons by any state court for" rejecting the third continuance request, Bates's "burden is to demonstrate

18

that there was no reasonable basis for the decision . . . to deny his claim."
*Tarleton*, 5 F.4th at 1291. "[I]f some fairminded jurists could agree with the
state court's decision, although others might disagree, federal habeas relief
must be denied." *Hill v. Humphrey*, 662 F.3d 1335, 1346 (11th Cir. 2011).

Bates cannot meet this demanding standard. "[B]road discretion must
be granted trial courts on matters of continuances; only an unreasoning and
arbitrary insistence upon expeditiousness in the face of a justifiable request
for delay violates the right to the assistance of counsel." *Morris v. Slappy*, 461
U.S. 1, 11–12 (1983). There are "no mechanical tests for deciding when a
denial of a continuance" satisfies this standard. *Ungar v. Sarafite*, 376 U.S.
575, 589 (1964). "The answer must be found in the circumstances present in
every case, particularly in the reasons presented to the trial judge at the time
the request is denied." *Id.* Because this rule is "general," the state court had
substantial "leeway" in deciding Bates's claim. *Yarborough v. Alvarado*, 541
U.S. 652, 664 (2004); *see also Himes v. Sec'y, Fla. Dep't of Corr.*, 690 F. App'x
640, 647 (11th Cir. 2017) (state court had "more leeway" in deciding
continuance-based due-process claim because applicable rule was
"general").

The state court stayed within its leeway here. A fairminded jurist could
conclude that the denial of Bates's third continuance request was not
"unreasoning and arbitrary." *Slappy*, 461 U.S. at 11. Trial had already been
continued twice, giving counsel an additional four months to prepare. *See
United States v. Farkas*, 474 F. App'x 349, 355 (4th Cir. 2012) (denial of

continuance was not "unreasoning and arbitrary" where, among other things, "the case had been continued twice"). In seeking the first continuance, counsel cited the need to obtain "[e]xtensive DNA reports." (Doc. 16-2, Ex. 50, at 20.) That was the same reason counsel sought the third continuance, but as the prosecution explained, counsel gave no indication that the "issues" with "his office" would "be resolved with additional time." (*Id.*, Ex. 11, at 5.) And while counsel said a "DNA expert" "might be willing to do this pro bono," (*id.* at 4), he did not show that "substantial favorable testimony would be tendered by" the expert, nor did he claim that the expert was "available and willing to testify," *United States v. Darby*, 744 F.2d 1508, 1522 n.6 (11th Cir. 1984). Finally, the state court could have appropriately considered the harm to the victim's family from any further delay. *See Houston v. Schomig*, 533 F.3d 1076, 1079 (9th Cir. 2008) (denial of continuance was reasonable based on, among other factors, "the potential impact a continuance may have had on the victims and witnesses").

Because "some fairminded jurists could agree" that the denial of a third continuance did not violate the constitution, "federal habeas relief must be denied." *Hill*, 662 F.3d at 1346.

### E. Ground Five—Failure to Present Exculpatory Evidence

Bates contends that trial counsel was ineffective for failing to "investigate and present . . . material evidence in support of [his] innocence." (Doc. 1 at 15.) According to Bates, counsel could have "refute[d]" the prosecution's DNA evidence by presenting testimony from "DNA expert"

Dan Krane. (*Id.*; *see also* Doc. 16-2, Ex. 31, at 2.) As noted above, the jury heard that fingernail clippings from the victim's left hand matched Bates's DNA, and that the probability the DNA belonged to someone else was "approximately one in 550,000." (Doc. 16-2, Ex. 15, at 440–41.)

To support his claim, Bates cites an email Krane sent to counsel before trial. (*Id.*, Ex. 32, at 8.) Krane said that he had "read through the report from DNA Labs International." (*Id.*) He disagreed with the "lab's conclusion," claiming that "[a]t the very least the test results should be described as being 'inconclusive.'" (*Id.*) In a separate letter to counsel, Krane reiterated that he did "not agree with the testing laboratory's conclusion regarding the fingernail clippings." (*Id.*, Ex. 37, at 45.) He cautioned, however, that he needed the "underlying information" to perform "a complete evaluation" of the DNA evidence. (*Id.*)

According to Bates, counsel should have hired Krane to "counter the state's DNA expert" at trial. (*Id.*, Ex. 31, at 3.) Krane's testimony allegedly would have been "crucial, critical, and highly relevant to the defense." (*Id.* at 4.) Moreover, the failure to call Krane as a witness allegedly "limited" Bates's "trial strategy," causing him to forgo an "alibi" defense. (*Id.*, Ex. 39, at 2; *see also* Doc. 1 at 15.)

The postconviction court held an evidentiary hearing on this claim. (Doc. 16-2, Ex. 36.) Krane was not called as a witness. Trial counsel testified that he could not hire Krane due to "funding issues." (*Id.* at 23.) The prosecution's DNA expert (Tiffany Roy) defended her original analysis,

claiming that Krane wrongly assumed the fingernail clippings contained "an even mixture of two individuals." (*Id.* at 58.) Instead, Roy explained, the clippings contained one "major" profile (the victim's) and one "minor" profile (Bates's). (*Id.*) Thus, Roy testified that "what [Krane] said" "just [did not] apply to [her] analysis." (*Id.*) The court also heard from Martin Tracey, a retired professor of biology and genetics. (*Id.* at 72.) Tracey analyzed the DNA evidence and concluded that Roy's original findings were "appropriate according to the guidelines established at th[e] time." (*Id.* at 78.) Tracey also found no "data that supported" excluding Bates as a contributor to the DNA taken from the clippings. (*Id.*)

The postconviction court rejected Bates's ineffective-assistance claim in a written order. (*Id.*, Ex. 41.) It held that Bates "failed to prove that he suffered prejudice when [counsel] did not call an expert witness to rebut the state's analysis of the DNA evidence presented at trial." (*Id.* at 8.) The court acknowledged that Roy and Krane "interpreted the information differently from the very beginning of the analysis." (*Id.* at 9.) But the court found "credible" Tracey's testimony that Roy's "methodology and results [were] sound." (*Id.*) And "without further evidence or explanation to rebut [ ] Roy's assertions," the court was "unable to find that trial counsel's failure to call" Krane "undermined the reliability of the outcome of the trial." (*Id.* at 9–10.)

According to the court, calling Krane as a witness "would have likely led to a battle of the experts, with each side presenting conflicting expert testimony [about] the statistical probability that the DNA belong[ed] to

[Bates]." (*Id.* at 10.) But, the court explained, "the DNA was not the only evidence that the state presented during the trial to prove that [Bates was] guilty." (*Id.*) Specifically, Jacniqua Jones testified that (1) "she was with [Bates] and the victim on the day the crime occurred," (2) Bates told her "he planned to rob the victim," (3) she saw Bates "choking the victim," and (4) Bates instructed her to "lie to police about the day's events." (*Id.*) The court noted that Jones's testimony was "supported by a considerable amount of additional evidence." (*Id.*) For example, Jones "identified [Bates] as the murderer before the DNA test results found him to be a contributor to the DNA under the victim's fingernails, surveillance video support[ed] her timeline of events, and cellphone records also corroborate[d] her testimony." (*Id.*) Given the "additional evidence presented at trial," Bates could not show that the "omission" of Krane's "proposed testimony undermine[d] confidence in [the] guilty verdict." (*Id.* at 10–11.)

The postconviction court reasonably found no prejudice. "The prejudice prong requires the petitioner to establish a reasonable probability that, but for counsel's errors, the outcome at trial would have been different." *Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1261 (11th Cir. 2014). "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, "counsel's errors [must be] so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687. "Applying AEDPA to *Strickland*'s prejudice standard, [I] must decide whether the state

court's conclusion that [counsel's] performance . . . didn't prejudice [Bates]—that there was no substantial likelihood of a different result—was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Mungin v. Sec'y, Fla. Dep't of Corr.*, 89 F.4th 1308, 1317 (11th Cir. 2024).

Bates cannot make the required showing. Even apart from the DNA evidence, the prosecution presented "substantial evidence" of Bates's guilt. *Fugate v. Head*, 261 F.3d 1206, 1224 (11th Cir. 2001); *see also McCoy v. Newsome*, 953 F.2d 1252, 1262 (11th Cir. 1992) ("[T]he other substantial evidence of [petitioner's] guilt negates any possibility of prejudice resulting from his attorney's failure to subpoena the alibi witnesses."). Most importantly, Jones testified that she saw Bates choke the victim after saying that he "wanted to rob" him. (Doc. 16-2, Ex. 15, at 336, 340.) Bates later got Jones to tell police that "Ken"—who did not exist—was the last person she saw with the victim. (*Id.* at 343–44.) Bates went along with the lie, telling a detective that Ken was a "drifter [who] came by . . . on occasion to use his phone." (*Id.* at 252–53.) Furthermore, several pieces of evidence corroborated Jones's testimony—the surveillance footage showing the victim filling the Dilaudid prescription, the phone records establishing that Bates called Jones several times on the day of the murder, and the victim's physical injuries, which were "consistent with him being in a chokehold." (*Id.* at 237, 240, 298, 416–20.) Given the strength of the prosecution's case, a reasonable jurist could find that the

failure to present rebuttal DNA evidence did not prejudice Bates.[7] *See Bates v. Sec'y, Fla. Dep't of Corr.*, 768 F.3d 1278, 1300 n.9 (11th Cir. 2014) ("The overwhelming evidence of [petitioner's] guilt . . . makes it obvious that [he] cannot show *Strickland* prejudice.").

Moreover, Bates fails to show that Krane would have "refute[d]" the prosecution's DNA evidence. (Doc. 1 at 15.) Krane did not testify at the evidentiary hearing, and he acknowledged in his letter that he could not perform "a complete evaluation" without additional information. (Doc. 16-2, Ex. 37, at 45.) Thus, it is not entirely clear what Krane would have said at trial. At best, the jury would have heard "a battle of the experts, with each side presenting conflicting expert testimony [about] the statistical probability that the DNA belong[ed] to [Bates]." (*Id.*, Ex. 41, at 10.) Given the other evidence against Bates, a fairminded jurist could find "no reasonable probability that a 'battle of the experts' would have been sufficient to raise a reasonable doubt."[8] *Jackson v. Day*, No. 96-30563, 1997 WL 450202, at *2 (5th Cir. July 16, 1997).

---

[7] Bates refers to an "alibi" defense, but he does not name any witness who could have provided him with an alibi. (Doc. 1 at 15.) Thus, he cannot show prejudice from the failure to present such a defense. *See Bray v. Quarterman*, 265 F. App'x 296, 298 (5th Cir. 2008) ("To prevail on [an ineffective-assistance claim for failure to call a witness], the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.").

[8] In his petition, Bates does not argue that counsel was deficient for failing to secure $500 to pay for the DNA analyst's bench notes. (Doc. 1.) Even if he had raised this argument,

## V.   **CERTIFICATE OF APPEALABILITY**

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Instead, a district court or court of appeals must first issue a certificate of appealability (COA). *Id*. "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a COA, Bates must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Bates has not made the requisite showing. Finally, because Bates is not entitled to a COA, he is not entitled to appeal in forma pauperis.

It is therefore **ORDERED** that Bates's Petition for Writ of Habeas Corpus, (Doc. 1), is **DENIED**. The **CLERK** is directed to enter judgment against Bates and in Respondent's favor and to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on July 22, 2025.

Kathryn Kimball Mizelle
United States District Judge

---

the postconviction court reasonably concluded that (1) counsel's "failure to continue requesting the funds after his office would not approve the expenditure" was not "contrary to reasonably competent performance," and (2) Bates failed to show prejudice because he did not "explain[ ] what information [he] needed or was expecting to find in the background notes." (Doc. 16-2, Ex. 41, at 6-7.)